J-S41024-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SUSAN C. SMITH | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| CHRISTOPHER C. SMITH | : | |
| Appellant | : | No. 190 MDA 2017 |

Appeal from the Order Entered December 29, 2016
In the Court of Common Pleas of Lebanon County
Civil Division at No(s): 2013-20491

\*\*\*\*\*

| | | |
|---|---|---|
| SUSAN C. SMITH | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| CHRISTOPHER C. SMITH | : | |
| Appellant | : | No. 191 MDA 2017 |

Appeal from the Order Entered September 15, 2015
In the Court of Common Pleas of Lebanon County
Civil Division at No(s): 2013-20491

\*\*\*\*\*

| | | |
|---|---|---|
| SUSAN C. SMITH | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| CHRISTOPHER C. SMITH | : | |
| Appellant | : | No. 192 MDA 2017 |

J-S41024-17

Appeal from the Order Entered December 29, 2016
In the Court of Common Pleas of Lebanon County
Civil Division at No(s): 2013-20491

BEFORE:  GANTMAN, P.J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:               **FILED SEPTEMBER 07, 2017**

These are three consolidated appeals filed by Christopher Smith ("Husband"), *pro se*, from the orders entered on September 15, 2015 and December 29, 2016.[1]  The September 15, 2015 order entered a divorce decree and order of equitable distribution/qualified domestic relations order ("QDRO"), and the December 29, 2016 order granted Susan C. Smith's ("Wife") motion to compel Husband to sign Wife's proposed QDRO, and denied Husband's motion to compel Wife to sign the QDRO that he proposed. After our review, we quash the appeal at 191 MDA 2017, and affirm the appeals at 190 MDA 2017 and 192 MDA 2017.[2]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Two of Husband's appeals, 190 MDA 2017 and 192 MDA 2017, are from the same order, entered on December 29, 2016.  This Court consolidated these appeals, *sua sponte*, with the appeal filed at 191 MDA 2017.  **See** Order, 2/13/17.  **See also** Pa.R.A.P. 513.  Because Husband's appeal from the September 15, 2015 order was stayed and subsequently withdrawn, we quash the appeal docketed at 191 MDA 2017.  **See** discussion *infra*, at p. 8.

[2]  Wife's counsel has notified this Court that, due to Wife's limited resources, she would not be filing an appellee's brief. Counsel has indicated agreement with the trial court's findings and opinion.

- 2 -

The parties were married on September 15, 1984; they separated on February 24, 2014. The parties have an adult son, who is now 29 years old.

On June 12, 2014, the court appointed Loreen Burkett, Esquire, as a special master to hear the issue of alimony *pendent lite* (APL). On June 23, 2014, the court appointed Special Master Burkett to make recommendations on the claim for equitable distribution. Following a hearing on February 24, 2015, Special Master Burkett determined that Wife was entitled to APL and recommended Husband pay $1,178.00 per month. Husband, who argued Wife had not demonstrated need for APL, filed exceptions. The trial court denied Husband's exceptions, and, thereafter, denied Husband's motion for reconsideration. Husband appealed to this Court, and we quashed that appeal. **See Smith v. Smith**, 121 MDA 2015 (Order, filed February 12, 2015). **See also Calibeo v. Calibeo**, 663 A.2d 184 (Pa. Super. 1995) (order for either spousal support or alimony *pendente lite* is interlocutory and not appealable until all economic claims have been resolved).

On April 28, 2015, Special Master Burkett filed a motion for withdrawal, stating that she had recently "identified an issue which may create the appearance of a conflict in the future[.]" Motion for Withdrawal of Appointment of Special Master, 4/28/15, at ¶ 5. On May 5, 2015, the court granted the motion to withdraw and appointed Keith Kilgore, Esquire, as Special Master, who, on May 12, 2015, petitioned the court to appoint an alternate because he had previously represented Husband. On May 18,

2015, the court vacated Kilgore's appointment and appointed Anne Kline, Esquire, to address the issues of divorce, equitable distribution and alimony.

On July 7, 2015, Special Master Kline recommended a divorce be granted pursuant to section 3301(c) of the Divorce Code,[3] and that the marital assets be distributed 53% to Wife and 47% to Husband; she also recommended Wife's request for alimony be denied.

Husband and Wife both filed exceptions. The Honorable Bradford H. Charles dismissed both parties' exceptions and entered an order on September 15, 2015, which states, in relevant part:

> AND NOW, THIS 15TH DAY OF September, 2015, after a careful consideration of the file, including the transcript of the hearing on February 24, 2015 and the Special Master's report of July 7, 2015, the Exceptions filed by both parties in the above-captioned matter are DENIED and the recommendations of the Special Master are AFFIRMED in their entirety as follows:
>
> 1. Pursuant to Section 3301(c) of the Divorce Code, Susan C. Smith (hereafter "Wife") and Christopher C. Smith (hereafter "Husband") are hereby divorced from the bonds of matrimony.
>
> 2. Provided that no appeal of this decision is filed, alimony *pendente lite* will be terminated effective immediately. If an appeal is filed, we will entertain a hearing to determine whether alimony *pendente lite* should continue during the pendency of the appeal.

_____

[3] Section 3301(c) provides: "The court may grant a divorce where it is alleged that the marriage is irretrievably broken and 90 days have elapsed from the date of commencement of an action under this part and an affidavit has been filed by each of the parties evidencing that each of the parties consents to the divorce." 23 Pa.C.S.A. § 3301(c).

3. The marital property, excluding the joint TD Ameritrade stock account and Husband's [State Employee Retirement System] Pension [SERS], shall be divided 53% to Wife and 47% to Husband, with an offset for credits.

\* \* \* \*

7. Within sixty (60) days of the date of the final decree, Husband shall pay to Wife the sum of $92,310.88 to effectuate equitable distribution of the [marital] assets.

8. Husband's existing SERS pension value shall be divided equally between the parties by way of a QDRO. Husband shall elect the survivor annuity option. QDRO preparation costs shall be divided between the parties.

9. The joint TD Ameritrade stock account shall be divided 53% to Husband and 47% to Wife based upon its current valuation at the time [] the final Divorce Decree is entered.

10. Wife's request for alimony is DENIED.

Order, 9/15/15.

On October 5, 2015, Husband filed a *pro se* notice of appeal. Wife filed a petition to stay the order pending appeal, averring irreparable harm in that Husband "will be free to remarry and name his future spouse as a beneficiary of his State Employees Retirement Pension to which [Wife] was awarded a fifty percent (50%) share." Application for Stay, 10/14/15, ¶ 6. The court granted the stay on October 20, 2015. Despite the filing of an appeal from the September 15, 2015 order, Husband filed a petition to seek enforcement of that order on October 19, 2015. The court denied that request on October 22, 2015, and five days later Husband filed a motion

seeking disqualification of the Honorable Bradford H. Charles. *See* Motion for Immediate Disqualification of Judge Bradford H. Charles Due to Multiple Violations of the Code of Judicial Conduct, 10/27/15.

In his motion, Husband claimed Judge Charles allowed Wife's attorney "to knowingly make false statements about [Husband,] . . . and is clearly biased against [Husband] in his rulings and actions by allowing this misconduct of [Wife's] lawyer." *Id.* at 2. Husband also claimed that Judge Charles' granting of Wife's petition for stay "is illegal and biased against [him]." *Id.* On October 29, 2015, Judge Charles denied this motion, and also denied Husband's motion for reconsideration of the September 15, 2015 order. Order of Court, 10/29/15. Order of Court, 10/29/15.

On November 3, 2015, Husband filed a "Motion to the President Judge of the Court of Common Pleas of Lebanon County for the Immediate Reconsideration and Disqualification of Judge Bradford H. Charles due to Multiple Violations of the Code of Judicial Conduct[.]" In support of this motion, Husband averred, in part:

> This judge has refused to properly calculate the APL payment based upon the laws of the Commonwealth of Pennsylvania and adjusted [Husband's] APL payment. This violation of the Code of Judicial Conduct has forced [Husband] to pay [Wife] over $270 a month more than the maximum amount allowed by law.
>
> Rule 2.3 requires a judge to perform the duties of judicial office without bias or prejudice. A judge shall not by words or conduct, manifest bias or prejudice. **Judge Charles has showed his distaste towards [Husband] by making a**

**number of derogatory comments about [Husband] during the Judge's Opinion on Equitable Distribution** [referring to Judge Charles' September 15, 2015 opinion].[4]

The granting of the Stay Order is illegal and biased against [Husband] on the following grounds:

Since [Husband] is fully willing to comply with the September 15, 2015 Divorce Decree and Order of Equitable Distribution, there can be absolutely no harm to [Wife] to allow the Entry and Execution of this September 15 order. [Wife], who is the moving party in the divorce, is not requesting reconsideration, nor is [Wife] appealing the September 15, 2015 Divorce Decree and Order of Equitable Distribution. So if [Husband] fully complies with the Order, even while [Husband] is appealing the Order, there is no legal reason for the Stay to be granted. There is no justifiably claim of economic harm to [Wife] that [Wife] can make. **The only reason Judge Charles signed this Order is his blatant bias against [Husband]**.

**The biased Judge failed to consider any of the economic and health issues (diagnosis of cancer) being endured by [Husband].**

Motion, 11/13/15, at 2-4 (emphasis added).

_____

[4] The trial court stated in its opinion that Husband has "impugned the integrity of everyone who disagrees with him[.]" Opinion, 9/15/15, at 1. From our review of Husband's motions, it appears that the court's statement is an accurate assessment. Husband's characterizations of the judge, the master, the judicial system and Wife's attorney, ("the biased judge," the "incompetent judge and domestic relations master," the "lack of integrity in Lebanon County," describing the Lebanon County judicial system as a "compete cesspool of nepotism," and references to the "unethical lawyer" who "needs a lesson in English," to list a few), are inappropriate and detract from his legal arguments.

On November 4, 2015, Judge Charles entered an order denying this second motion to disqualify, noting that President Judge John C. Tylwalk assigned him to preside over issues pertaining to this divorce.[5] In his order, Judge Charles stated:

> Prior to being assigned the responsibility to preside over issues in the above-referenced matter, this Jurist had no known contact with either [Wife] or [Husband]. This Jurist is not acquainted with either party, nor did this Jurist have any known business relationship with either party at any time in the past. This Jurist has rendered decisions that have angered [Husband]. By itself, that does not create grounds for disqualification. The fact that [Husband] has filed vitriolic-infused motions that have disparaged this Jurist also does not create a ground for this Jurist to recuse himself. . . . [Husband] has appealed the decision rendered by this Jurist with respect to divorce, equitable distribution and alimony pendente lite. We do not question [Husband's] ability to file and pursue an appeal, nor has [his] appeal engendered any personal animus by this Jurist toward him. [Husband] has asked us to enforce the Order we entered that he has appealed. We will not do this. So long as any party challenges the viability of a civil divorce order by filing an appeal, it would be improper for this Court to enforce said Order prior to a decision by the Pennsylvania Superior Court.

Order, 11/4/15, at 1-3.

Thereafter, Husband filed an emergency petition in this Court to vacate the trial court's October 20, 2015 order staying enforcement of the September 15, 2015 order. This Court denied that petition. On November

_____

[5] On November 11, 2015, President Judge Tylwalk issued an order denying Husband's motion seeking disqualification of Judge Charles. President Jude Tylwalk stated that Judge Charles "is in the best position to determine whether he is able to continue to preside impartially." Order, 4/11/15.

16, 2015, Husband filed an application to withdraw his appeal, which this Court granted on November 24, 2015. That same day, the trial court vacated the stay order, reinstated its September 15, 2015 order, and the parties were divorced.

On April 19, 2016, Wife filed a petition to compel Husband to sign the QDRO. The court held a hearing on June 9, 2016, at which the parties disagreed on the term "survivor annuity option." Husband claimed that if Wife predeceased him, Wife's share should revert and become his property. Wife disagreed. The court scheduled another hearing for December 2, 2016, giving the parties time to consult with experts on the meaning of the term, "survivor annuity option."

On August 29, 2016, Wife filed a second petition to compel Husband to sign her proposed QDRO; on November 28, 2016, Husband filed a motion to compel Wife to sign his proposed QDRO. At a hearing on December 2, 2016, both parties testified; Wife's expert, Mark Altschuler, President of Pension Analysis Consultants, also testified. On December 29, 2016, the court entered an order granting Wife's motion to compel Husband to sign the QDRO prepared by Wife's expert, specifying that the parties were to share the costs of preparation equally, denying Husband's motion to compel Wife to sign his proposed QDRO, and denying Husband's continuing request that Judge Charles recuse himself. *See* Order, 12/29/16.

Husband appealed on January 24, 2017, and the court ordered Husband to file a Pa.R.A.P. 1925(b) concise statement of errors complained

of on appeal. Husband filed his Rule 1925(b) statement on February 13, 2017.

In his appellate brief, Husband raises 39 issues, spanning ten pages of his brief. *See Commonwealth v. Snyder*, 870 A.2d 336, 340 (Pa. Super. 2005) ("14 very verbose issues which span three pages of his brief" constituted substantial defect permitting quashal). "Although the page limit on the statement of questions involved was eliminated in 2013, verbosity continues to be discouraged." Pa.R.A.P. 2116, comment. "The appellate courts strongly disfavor a statement that is not concise." *Id*.[6] Due to the verbosity and confusing nature of Husband's issues, we will attempt to address Husband's main points of contention, which we have taken from his Rule 1925(b) statement.[7] We have also reworded and condensed Husband's claims for ease of discussion and clarity:

> 1. Did the court err in refusing to admit as hearsay, at the June 9, 2016 hearing, an affidavit and "routine business

---

[6] We also note that Husband has failed to comply with Pa.R.A.P. 2135, which provides that "[a] principal brief shall not exceed 14,000 words" and "[a] party shall file a certificate of compliance with the word count limit if the principal brief is longer than 30 pages . . . when prepared on a word processor or typewriter." Pa.R.A.P. 2135(a)(1) and (d). The numbered pages, not including preliminary pages and appended exhibits, in Husband's appellate brief, amount to 69.

[7] *See Morgante v. Morgante*, 119 A.3d 382, 396 (Pa. Super. 2015) (holding Husband's failure to raise challenge to equitable distribution award in Rule 1925(b) statement constituted waiver).

correspondence" by SERS Assistant Counsel Salvatore A. Darigo, Jr.?

2. Did the court err or abuse its discretion in recessing the June 9, 2016 hearing and continuing it to December 2, 2016?

3. Did the court err in allowing testimony of Wife's expert witness, Mark Altschuler, at the December 2, 2016 hearing?

4. Did the court err in finding Mark Altschuler's testimony was not hearsay and was credible?

5. Did the court err in ordering Husband to sign the QDRO proposed by Wife, which does not comply with the equitable distribution order, where the payout calculation was based on a maximum single life annuity and not the survivor annuity option, thus precluding the pension amount awarded to Wife to revert back to Husband in the event Wife predeceases Husband?

6. Did the court err or abuse its discretion in awarding Wife alimony *pendent lite*, and in precluding Husband from cross-examining Wife on financial matters?

7. Did the court err or abuse its discretion in denying Husband's motion to recuse?

Pa.R.A.P. 1925(b) Statement, 2/13/17 (rephrased and renumbered).

Our role in reviewing equitable distribution awards is well settled:

Our standard of review in assessing the propriety of a marital property distribution is whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure. An abuse of discretion is not found lightly, but only upon a showing of clear and convincing evidence.

***McCoy v. McCoy***, 888 A.2d 906, 908 (Pa. Super. 2005) (internal quotations omitted). Further, this Court will only find an abuse of discretion where "the law has been overridden or misapplied or the judgment exercised was

manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record." **Biese v. Biese**, 979 A.2d 892, 895 (Pa. Super. 2009) (quotations and citations omitted). When reviewing an award of equitable distribution, "we measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights." **Hayward v. Hayward**, 868 A.2d 554, 559 (Pa. Super. 2005). Moreover, in determining the propriety of an equitable distribution award, the court must consider the distribution scheme as a whole. **Biese**, **supra**. "[I]t is within the province of the trial court to weigh the evidence and decide credibility and this Court will not reverse those determinations so long as they are supported by the evidence." **Morgante**, 119 A.3d at 387.

Husband's first five claims are related. As such, we will discuss them together. As detailed in the facts above, Special Master Kline recommended Husband's SERS pension be divided equally between the parties by way of a QDRO, and that "Husband shall elect the survivor annuity option." Special Master's Report, Recommendation 6, 7/15/15. At the June 9, 2016, hearing on Wife's motion to compel, during Husband's cross-examination of Wife, Husband attempted to enter into evidence a letter from Salvatore Darigo, Jr., of the State Employee Retirement System, pertaining to Husband's proposed QDRO. N.T. Hearing on Motion to Compel, 6/9/16, at 21. Wife's counsel objected, arguing it constituted hearsay.

The court ruled as follows:

THE COURT: I agree. We're not going to get into the substance of this today. We're obviously going to need another hearing to have additional expert testimony provided. If he wants to show her the letter in order to establish a sequence of events, he may do so, but it's for that purpose only. So if you want to show Ms. Smith the letter to get into the sequence of events, you may do so.

* * * *

BY MR. SMITH: Okay. So would you agree that on that May 5th document from Salvatore Darigo that in the first paragraph he does say that the attached would be acceptable to SERS?

MS. WEISS [WIFE'S COUNSEL]: Objection.

THE COURT: It's the same objection he made to your exhibits. I will allow some questions about this document to establish the sequence of events. I will not allow the substance of what is contained in this letter to be proven for the truth of the matter asserted. Unless both of you agree to waive any hearsay problems, the truth of the matter is going to have to be established by witnesses on the witness stand who have personal knowledge of these pension.

MS. WEISS: I agree. I don't want to waive.

THE COURT: Okay. So with that, the objection is sustained.

MR. SMITH: I'm just asking her whether or not the paragraph says that the document attached is acceptable to the retirement system.

THE COURT: And that's calling for a substantive answer. Just like you objected when Ms. Weiss tried to get substantive information in through the letters, she's objecting to your effort to do that. I sustained your objections and I'm sustaining hers . . . . [Y]ou're asking for me to accept that that letter is accurate and without the witness to testify to the accuracy of the letter I cannot accept that. You want to question her about: did you receive this letter? What did you do with the letter? That establishes a sequence of events. ***But I'm telling both sides that as to the substance of which QDRO is correct and which QDRO is not correct, I'm going to need testimony from people that have personal knowledge about [the]***

- 13 -

> ***pensions and QDROs at issue. This witness does not have that expertise or that personal knowledge.***

***Id.*** at 21-25 (emphasis added).

The parties disagreed on the meaning of the term "survivor annuity option." Husband interpreted it as meaning that if Wife predeceased him, before retirement, Wife's share should revert to him. Wife disagreed, and interpreted it as meaning if Wife predeceased Husband while the pension was in pay status, after retirement, only then would it revert back to him:

> MS. WEISS: ***I think [t]hat the biggest objection we have is that it does not provide for the survivor annuity properly. . . . Paragraph 12 says that if she dies everything reverts back to him and that's not the case in a survivor annuity. It's not the law. It's not the case. When she dies, if she dies before he goes into retirement, it becomes part of her estate***. . . .

> MR. SMITH: That's an incorrect assessment, sir. Because the survivor annuity is provided for assuming she stays alive. SERS allows for overriding of the annuity at the point of the various parties' death[s].

> THE COURT: . . . I don't know what you're both trying to communicate, but what I just heard you both agree. You both agree that if she dies the amount of the QDRO goes into her estate.

> MR. SMITH: No, I do not agree with that and actually neither does Attorney Weiss.

> MS. WEISS: I certainly do. And so does my expert.

> \* \* \* \*

> MR. SMITH: Sir, I'd also like to direct your attention to Exhibit Number 4, Paragraph Number 12, so basically it says here is if she dies before I retire, I pay her estate. If she dies after I retire all the proceeds revert to me, the member, so she agrees that if we're in a state of retirement that I should get all my

money back all the time. It's the last sentence in Paragraph 12 of the DRO that her own consultant put together.

MS. WEISS: And I believe that he's correct. I believe that my pension analyst guy is correct in interpreting what a survivor annuity means.

MR. SMITH: No, the survivor annuity says her benefits will revert to member. I am the member, meaning I get the money back.

MS. WEISS: When she dies after it's in pay status, not the way you want it, which is that it goes back to you at anytime she dies regardless of the pay status.

*Id.* at 29-33 (emphasis added).

At that point, the court entered an order on the record, which reads, in part:

   C. The Special Master did not define the term "survivor annuity option." This phrase is obviously a term of art. Neither of the parties have expertise to define the meaning of that term.

   D. ***It is obvious that expert testimony will be required to assist the Court in discerning what is meant by the phrase "survivor annuity option."*** It is also obvious that a new hearing will have to be scheduled to permit the parties to provide such expert opinion.

*Id.* at 33-34; Order, 6/9/16 (emphasis added). The court also ordered that each party provide the opposing party with a brief expert report, focused on the meaning of the phrase "survivor annuity option," and stated: "You both can have experts. . . . And then I'll hear testimony at the next hearing as to what is meant by the term 'survivor annuity option.'" *Id.* at 35. The court recessed the hearing and rescheduled it for December 2, 2016.

- 15 -

At the December 2, 2016 hearing, Mark Altschuler was qualified as an expert and testified on Wife's behalf.[8]  Husband cross-examined him, and Husband testified as well.  Husband did *not* present an expert on his behalf.

Against this backdrop, Husband challenges the court's rescheduling of the hearing, its refusal to admit the correspondence from SERS representative Darigo as substantive evidence on hearsay grounds, and its decision to allow Wife's expert to testify.  Each of these claims is meritless.

The trial court could not have been more transparent or justified in its reasoning for rescheduling the hearing, requiring expert testimony to assist the court in making a well-informed decision on the parties' main point of contention, and rejecting Husband's hearsay evidence.  Husband had an opportunity to challenge Wife's expert's report and to present his own expert.  As the trial court noted, Husband, "somewhat surprisingly," chose not to do so.  Instead, he attempted to present unsubstantiated hearsay evidence.  *See Sprague v. Walter*, 656 A.2d 80, 913 (Pa. Super. 1995) (affidavit is inadmissible hearsay when offered for its truth); *see also Botkin v. Metropolitan Life Ins. Co*., 907 A.2d 641 (Pa. Super. 2006) (report from financial expert, without testimony as to personal knowledge of matter, is hearsay).  Wife's expert's opinion, therefore, was unrebutted.

---

[8] Altschuler has a degree in mathematics and is a member of the American Academy of Pension Experts.  He has personally prepared over 10,000 QDROs, and he has testified as an expert in pension analysis over 60 times. N.T. Hearing, 12/2/16, at 11-13.

Further, the court found Wife's expert credible. This Court will not reverse credibility determinations as long as they are supported by the evidence. **Morgante**, 119 A.3d at 395. The trial court's reasons for accepting that testimony are supported by the record, and we decline to revisit the trial court's credibility determinations.

We conclude, therefore, that the court was within its discretion in accepting Wife's proposed QDRO with her interpretation of the term "survivor annuity option." Husband was neither surprised nor prejudiced by the court's decisions. We find no error or abuse of discretion. **See Smith v. Smith**, 653 A.2d 1259 (1995); **see also Miller v. Miller**, 617 A.2d 375 (Pa. Super. 1992) (where husband had opportunity to challenge wife's accounting expert's report on pension valuation, but instead offered unsubstantiated alternate calculation, and chose not to present his own expert valuation, court properly accepted report of wife's expert). Additionally, we find no abuse of discretion in the court's order requiring Husband to sign Wife's proposed QDRO. In doing so, the court effectuated economic justice.[9] **See Hayward**, **supra**.

_____

[9] As indicated above, there were insufficient liquid assets available to offset the value of the marital home, and thus the master recommended that a QDRO of Husband's pension be used to effectuate economic justice. The trial court agreed, emphasizing that "a portion of wife's equitable distribution award was provided via the QDRO." Trial Court Opinion, 12/28/16, at 19. "[Wife's] rights to Husband's pension granted through the divorce are part of her estate and she should retain the ability to designate how and where those rights are to be distributed in the event of her death." **Id.** at 20. The
*(Footnote Continued Next Page)*

Next, Husband argues the court erred or abused its discretion in awarding Wife alimony *pendent lite* [APL] and in precluding Husband from cross-examining Wife on financial matters.

We review APL awards under an abuse of discretion standard. **Haentjens v. Haentjens**, 860 A.2d 1056, 1062 (Pa. Super. 2004). APL is "an order for temporary support granted to a spouse during the pendency of a divorce or annulment proceeding." 23 Pa.C.S.A. § 3103. It "is designed to help the dependent spouse maintain the standard of living enjoyed while living with the independent spouse." **Litmans v. Litmans**, 209, 673 A.2d 382, 389 (Pa. Super. 1996). APL is thus not dependent on the status of the party as being a spouse or being remarried but is based, rather, on the state of the litigation, **DeMasi v. DeMasi**, 597 A.2d 101, 104–105 (Pa. Super. 1991), and "focuses on the ability of the individual who receives the APL during the course of the litigation to defend her/himself[,]" and the only issue is whether the amount is reasonable for the purpose, which turns on the economic resources available to the spouse." **Haentjens**, at 1062; **see also Carney v. Carney**, --- A.3d --- (filed July 11, 2017).

In one of the trial court's four comprehensive opinions in this case, the Honorable Bradford H. Charles sets forth a comprehensive analysis of

---

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

order entered on December 28, 2016 granted Wife's motion to compel Husband to sign the QDRO prepared by Wife's expert, and it specified that costs of preparation be shared *equally between the parties. **Id**. at 21.*

- 18 -

Husband's challenge to the award of APL. *See* Trial Court Opinion, 12/19/14, at 6-21 (award of alimony pendente lite is within sound discretion of trial court; court evaluated facts and circumstances, noting significant income discrepancy, and concluded Wife established financial need). We, therefore, rely upon that opinion to dispose of this claim.

In his final issue, Husband claims the court abused its discretion in denying his continuing requests that Judge Charles, who has presided over this litigation since its inception, recuse himself. This Court presumes judges of this Commonwealth are "honorable, fair and competent," and, when confronted with a recusal demand, have the ability to determine whether they can rule impartially and without prejudice. *Commonwealth v. White*, 734 A.2d 374, 384 (Pa. 1999). The party seeking disqualification has the burden of producing evidence establishing bias, prejudice, or unfairness necessitating recusal, and the "decision by a judge against whom a plea of prejudice is made will not be disturbed except for an abuse of discretion." *Commonwealth v. Darush*, 459 A.2d 727, 731 (Pa. 1983).

We discern no evidence of partiality on the part of Judge Charles. On the contrary, his rulings were evenhanded and thoughtfully analyzed. Husband's claims of bias and repeated characterizations of Judge Charles as the "biased judge" throughout his two motions to disqualify, is unsupported in the record, and his unsubstantiated accusations and allegations, strike this Court as bluster. We are in full agreement with Judge Charles: "[T]he time has come for both parties to dial down their rhetoric and focus their

attention on moving beyond their vitriolic past. . . . [I]t is now time for both HUSBAND and WIFE to move forward with their respective lives." Opinion, 9/15/15, at 1, 21.

We affirm the trial court's orders, and rely in part on the opinion dated December 19, 2014. We direct the parties to attach a copy of that opinion in the event of further proceedings.

Orders in 190 MDA 2017 and 192 MDA 2017 affirmed. Appeal in 191 MDA 2017 quashed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/7/2017

# IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY PENNSYLVANIA

## CIVIL ACTION – FAMILY DIVISION

SUSAN C. SMITH             : NO. 2013-20491
        Plaintiff,        :
                     :
      v.                 :
                     :
CHRISTOPHER C. SMITH       :
        Defendant          :

**APPEARANCES:**

M. Jannifer Weiss, Esquire    For Susan C. Smith
WEISS, WEISS & WEISS

Jessica E. Lowe, Esquire    Former Counsel for Christopher
                                C. Smith

Christopher C. Smith    *Pro Se*

## OPINION BY CHARLES, J., December 19, 2014

This case focuses upon the interplay between financial need and alimony pendente lite (APL). Susan Smith (hereafter "WIFE") argues that proof of financial need is no longer a predicate to an award of APL. In contrast, Christopher Smith (hereafter "HUSBAND") argues that a threshold showing of financial need is necessary before any APL can be awarded. Our research has revealed legal precedent that supports the arguments proffered by both sides. However, because we conclude that APL cannot statutorily or historically be equated with spousal support, and because we therefore conclude that something other than the marital

1

relationship is needed to support APL, we hold today that a spouse seeking APL must establish at least some threshold proof of financial need. However, we also hold that the definition of "financial need" must of necessity be fluid and determined based upon the unique circumstances presented by each factual dispute. As we will outline in more detail below, we hold in this case that WIFE has in fact established that she has a need for APL, and we will therefore affirm the decision of the Special Master to require that HUSBAND pay APL to WIFE.

## I.   FACTS

HUSBAND and WIFE were married on September 15, 1984. The relationship obviously had its ups and downs. Even before separation, WIFE filed a Complaint for Divorce on June 25, 2013. Included in WIFE's Complaint was a request for APL. However, WIFE did not pursue her claim for APL until June of 2014. At that time, WIFE left the marital residence to move into an apartment. (Special Master Report at pg. 2). Attorney Loreen Burkett was appointed as Special Master to hear only WIFE's claim for APL.

A hearing regarding APL was conducted before the Special Master on August 26, 2014. At that hearing, both parties described a pre-separation lifestyle that could be classified as upper middle class. Moreover, both parties were able to pay the cost of their son's college education. WIFE aptly said that after college education was paid: "I did not have any worries financially." (N.T. 14).

2

The parties' relatively good lifestyle was based upon the fact that each has enjoyed a relatively good job. HUSBAND has been employed by the Pennsylvania Higher Education Assistance Agency. Although HUSBAND did not provide 2014 income information, WIFE produced a 2013 W-2 wage statement that revealed wages of $105,207.09 and a 2012 W-2 that reflected earnings of $102,172.33.[1] Therefore, she evaluated HUSBAND's 2013 annual income and calculated HUSBAND's monthly income at $8,750.00. WIFE has been employed as an office manager at Vision Works, Inc. She is salaried at $46,000.00 per year. However, she also receives bonuses. WIFE did produce evidence of her income during 2014. Based upon WIFE's 2014 income documentation, the Special Master determined her gross monthly income to be $4,429.16.

Following separation, HUSBAND remained in the martial home. WIFE obtained an apartment at the Rockledge Apartment Complex near Palmyra. She testified that her standard of living has declined since separation. (N.T. 15). She specifically testified that she has cut back on expenses and can no longer afford a vacation or new clothing. She summarized her situation by stating: "I do not buy anything that I do not need." (N.T. 16). Moreover, she furnished her apartment by purchasing used items at a local thrift store. (N.T. 17-18). On cross examination, WIFE explained that while she is able to pay her bills, her expenses are

[1] In addition, the 2013 income tax return of the parties revealed capital gains of $82,901.00 during that calendar year. The Special Master determined that capital gains "can properly be considered as part of the marital estate for distribution purposes when the estate is later divided."

3

now based upon a lifestyle that is "substantially cut down" from that which she enjoyed during the marriage. (N.T. 38).

Stunningly, HUSBAND declined to testify or present documentary evidence at the APL hearing. Instead, he rested upon his cross-examination of WIFE and his argument that she had no need for APL. Specifically, HUSBAND argued that WIFE possessed $35,000.00 in a checking and savings account and that she should be required to draw down those amounts before collecting APL. HUSBAND focuses on WIFE's current expenses and argues: "She has the ability to afford all of her living expenses since moving out of the former marital residence..." (HUSBAND's Brief at 6).

Without conducting any extensive legal analysis, the Special Master accepted HUSBAND's premise that WIFE was required to prove financial need. However, the Special Master determined that WIFE did have financial need for APL. The Special Master stated:

> Husband argues that, even though his income may be substantially higher than Wife's, she has not demonstrated an actual need for an award of alimony pendente lite. He indicates that Wife has been able to meet all of her living expenses since moving out and has been able to pay her legal fees. However, Wife testified that she has only been out of the marital residence for two months and has taken measures to cut back on expenditures, not knowing what her actual income will be. She stated that the parties are only at the beginning of their legal expenses and they are estimated, and that she will incur more as time goes on. Wife indicated she does not have access to many of the marital funds. Wife has demonstrated actual need for an award of alimony pendente lite.

(Special Master's Report at 3).

4

Based upon the foregoing, the Special Master awarded APL to WIFE based entirely upon the Pennsylvania Spousal Support Guidelines. The calculations employed by the Special Master are set forth below:

|  | WIFE | HUSBAND |
|---|---|---|
| Total gross income per month | $4,429 | $8,750 |
| Less Deductions | $1,071 | 2,446 |
| Net Income | $3,358 | $6,304 |
| Difference | | $2,946 |
| Percent by which to multiply | | 40 |
| Amount of Monthly Alimony Pendente Lite Obligation | | $1,178 |

HUSBAND filed timely Exceptions to the decision of the Special Master. The primary focus of HUSBAND's Exceptions was that WIFE has not established need for APL. HUSBAND argued: "The learned Master erred and/or committed an abuse of discretion by adhering to the Spousal Support Guidelines in determining an award of APL, as the resulting sum is far more than WIFE needs to maintain herself throughout the divorce proceedings." Secondarily, HUSBAND also challenged the Special Master's decision that he should be required to pay a portion of WIFE's unreimbursed medical expenses.

Following the filing of Exceptions, HUSBAND asked this Court to stay his payment of APL during the pendency of the underlying substantive exceptions. By a Court Order dated October 16, 2014, we denied HUSBAND's request to stay payment of APL. HUSBAND then

5

discharged his lawyer and filed a *pro se* response by which he reiterated his argument that WIFE should not receive anything because she has no financial need.

As we began our evaluation of HUSBAND's exceptions to APL, we quickly realized the underlying legal precepts governing APL are more complicated than the parties had realized or we had anticipated. We will therefore begin our analysis by outlining the history of APL in Pennsylvania and how it has evolved to closely – but not completely – parallel spousal support. After analyzing the law, we will apply the facts of this case in order to reach our decision.

## II.   DISCUSSION

### A.   Legal Analysis

APL began as a precept of Pennsylvania common law. See, *Appeal of Groves*, 1871 WL11028, 68 Pa. 143 (1871). Its historical purpose was summarized in *Purman v. Purman*, 7 Pa. D & C 755 (1925):

> Alimony pendente lite is not a matter of right, but it is addressed at the sound discretion of the court, and the court may refuse it where cause against it is shown.
>
> The controlling element in granting an allowance in any case is the wife's necessity for it, the husband's ability to pay and all the circumstances of the particular case.
>
> The destitute condition of the wife is a necessary prerequisite to an order for alimony pendente lite. Her want of pecuniary ability must be shown affirmatively before an order will be made.

6

> The husband's ability to pay must be shown and not presumed, and if the husband's means are limited, the amount allowed will necessarily be limited.

*Id.* at 758. In 1929, the right to APL was codified by statute. See, 23 P.S. 46 (May 2, 1929) (repealed). However, the amount of APL was always considered to be "a matter of judicial discretion." *Meinel v. Meinel,* 167 A. 385 (Pa.Super. 1933).

When Pennsylvania's Divorce Code was created in 1990, APL was incorporated. Section 3702 of the Divorce Code States: "In proper cases, upon petition, the court may allow a spouse reasonable alimony pendente lite..." 23 Pa.C.S.A. § 3702. The definitional section of the Divorce Code defines APL as "An order for temporary support granted to a spouse during the pendency of a divorce or annulment proceeding." 23 Pa.C.S.A. § 3103. However, the Divorce Code does not specify when or in what amount APL should be awarded.

Until the advent of Pennsylvania's Support Guidelines, APL was determined at the discretion of trial courts on a case-by-case basis. From a broad perspective, our appellate courts recognized a distinct difference between spousal support and APL: the former arose out of the marital relationship itself and was designed to provide financial maintenance and support for the dependent spouse, while the latter was considered ancillary to a divorce action and was intended to equalize the ability of each spouse to prosecute or defend the divorce action. *Remick v. Remick,* 456 A.2d 163 (Pa.Super. 1983). The amount of APL was

7

determined based upon factors identical to those contained in the Divorce Code regarding alimony. See, e.g. *Dyer v. Dyer*, 536 A.2d 453 (Pa.Super. 1988) and *McNulty v. McNulty*, 500 A.2d 876 (Pa.Super. 1985). See also, 23 Pa.C.S.A. § 3701(b) (repealed).

Pennsylvania adopted Child Support Guidelines in 1981. These guidelines were expanded to include APL in 1994. The following provisions of the Support Guidelines now address APL:

- Rule 1920.31 requires that APL ordered by a Court must be paid through the local Domestic Relations Office.

- Rule 1910.16-1(c) provides that APL and spousal support cannot be enforced simultaneously.

- Rule 1910.16-1(c) requires a Court to consider the duration of the marriage in determining APL.

- Rule 1910.16-1(b) states: "The amount of support (child support, spousal support or alimony pendente lite) to be awarded...shall be determined in accordance with the support guidelines..."

In spite of these new APL rules – or perhaps because of them – the official comment to the Support Guidelines was amended to state: "Nothing in this Rule should be interpreted to eliminate the distinctions between spousal support and alimony pendente lite which are established by case law." Pa.R.C.P. 1910.1 (explanatory comment – March 30, 1994).

Since 1994, mixed messages have been articulated by courts which were called to rule upon APL issues. In *Calibeo v. Calibeo*, 663 A.2d

8

184 (Pa.Super. 1995), the Pennsylvania Superior Court acknowledged the APL changes created by the Support Guidelines and stated: "Since [the Support Guideline amendment] requires that alimony pendente lite be determined pursuant to the Support Guidelines, the difference between alimony pendente lite and spousal support, no matter if it is part of the divorce action or filed separately, is negligible..." *Id.* at 185. Moreover, our Supreme Court has applied the Support Guidelines and directed that finders of fact "calculate a spousal support or APL award according to the formula set forth in Rule 1910.16-4..." *Mascaro v. Mascaro*, 803 A.2d 1186, 1191 (Pa. 2002).

On the other hand, several Pennsylvania Superior Court cases have implied that financial need is a precondition of awarding APL. In *Schenk v. Schenk*, 880 A.2d 633 (Pa.Super. 2005), a trial court refused to adhere to the Support Guidelines because an obligee-wife lived with a boyfriend "who paid all of her bills." In affirming the trial court's decision, the Superior Court stated:

> As for the court's holding that wife is not entitled to APL for the time when she lived with boyfriend, we find no abuse of discretion. First, we note our agreement with husband that the Court's rationale in denying wife APL for the time she lived with her boyfriend appears not to be based simply upon her cohabitation, but rather upon her failure to prove her needs in defending herself in the divorce action...Alimony pendente lite is designed to be temporary and is available to those who demonstrate the need for maintenance and professional services during the pendency of the proceedings. Wife failed to demonstrate her need. Accordingly, we find no abuse of the Court's discretion.

9

*Id.* at 646, quoting in part *Jayne v. Jayne*, 663 A.2d 169, 176 (Pa.Super. 1995). See also *Childress v. Bogosian*, 12 A.3d 448 (Pa.Super. 2011) ("APL focuses upon the ability of the individual who receives the APL during the course of the litigation to defend her/himself, and the only issue is whether the amount is reasonable for the purpose..." *Id.* at 463).

Several common pleas decisions have evaluated the question of whether a financial need litmus test should be imposed as a predicate to an award of APL. Two courts reached the conclusion that it should not. In *Frerotte v. Frerotte*, 74 Pa. D & C 4th 298 (Fayette Co. 2005), the Court held that a deviation from the Guidelines in an APL case cannot occur unless the Court makes a determination that the Guidelines themselves would permit deviation. Even more explicit is an *en banc* decision by the Lehigh County Court in *Prud'homme v. Prud'homme*, 48 Pa. D & C 4th 182 (2000). In setting forth a comprehensive history of Pennsylvania law pertaining to spousal support and APL, the Court recognized that even under common law principles, both APL and child support "required the court to determine the recipient's needs based on the parties' standard of living while they lived together or their station in life, and the payor's ability to pay considering his/her income, property and earning capacity." The court stated:

> [S]pousal support and APL were always based on similar financial criteria, though the procedures and duration differed. As a result of the promulgation of new support rules by the Pennsylvania Supreme Court, and the interpretation of these rules by the Pennsylvania Supreme Court and the Pennsylvania Superior Court, many of the historical

10

distinctions between spousal support and APL have been eliminated. APL like spousal support shall be determined in accordance with the Uniform Support Guidelines. APL and spousal support shall not be in effect simultaneously. APL claimants, like spousal support claimants, need not prepare and file detailed income and expense statements. Upon the entry of a decree in divorce, if economic claims are still pending, a spousal support order shall be deemed an order for APL.

*Id.* at 192. Essentially, the *Prud'homme* court determined that "APL is merely a type of support awarded in divorce cases." *Id.* at 191. Having reached this conclusion, the Court in *Prud'homme* rejected the obligor's effort to create a financial need litmus test. The Court stated:

Husband's argument is contrary to both the letter and spirit of the Uniform Support Guidelines. First, from a linguistic standpoint, Rule 1910.16-1 states very specifically that APL, like spousal support and child support, is to be determined in accordance with the guidelines. If the guidelines establish APL...and there is no basis for a deviation, then APL is to be awarded in that amount, so long as there is a divorce action being pursued. There is no requirement under the support rules for a separate demonstration of financial need...Husband's contention, if adopted, would return us to the pre-guideline days when subjective judgments were made as to "need." This would reintroduce uncertainty into a process that is intended to be uniform and predictable.

*Id.* at 193, 194.

In contrast to *Frerotte and Prud'homme*, the Somerset County Court of Common Pleas determined that a preliminary finding of financial need must be established before the spousal support guidelines are applied. *Moore v. Moore*, 56 Som.L.J. 110 (1999). The Court in *Moore* emphasized that APL was founded on a different historical precept than was spousal support. Because APL was intended from the beginning to

11

enable a spouse to prosecute or defend a divorce action, a finding of need by the obligee spouse necessary follows in order to accomplish the purpose of APL.

To date, Pennsylvania's highest court has not yet had the opportunity to rule upon the question of whether financial need is a predicate to recovering APL. Moreover, we are aware of no Superior Court precedent that has either specifically mandated or rejected a request to employ the "financial need" litmus test prior to awarding APL.[2]

We were particularly impressed with the scholarly approach undertaken by the Lehigh County Court on the precise issue that is now before us. Nevertheless, we depart company with our colleagues in Lehigh County. As we read *Prud'homme*, we perceive that the Lehigh County Court has essentially equated APL with spousal support except in the very unusual situation where separated spouses are involved in litigation that does not include divorce proceedings. We simply cannot concur that our Supreme Court intended to transform APL into "merely a type of support awarded in divorce cases."

Our appellate courts have always recognized that APL and spousal support "differ in character." *Belshy v. Belshy*, 175 A.2d 348 (Pa.Super. 1962); *Hanson v. Hanson*, 110 A.2d 750 (Pa.Super. 1955); *Commonwealth ex rel Lipschultz v. Lipschultz*, 117 A.2d 793

---

[2] *Schenk* was affirmed by the Superior Court on two separate grounds. In addition to declaring that the wife had not established financial need, *Schenk* also recognized that the Support Guidelines themselves required a deviation because wife possessed "other income in her household" and this is a factor that the court must consider when determining whether to deviate from the Support Guidelines.

12

(Pa.Super. 1955). Spousal support has always been predicated upon the existence of a marital relationship and is designed to enable a dependent spouse to pay all of his/her necessary expenses. See, e.g. *Commonwealth ex rel Werline v. Werline*, 421 A.2d 1080 (Pa.Super. 1980). In contrast, alimony pendente lite has historically been designed to enable a dependent spouse to prosecute or defend a divorce proceeding. *Price v. Price*, 614 A.2d 1386 (Pa.Super. 1992).[3] To our knowledge, no statute, rule of court or appellate decision has ever equated APL and spousal support as did *Prud'homme*.

We place significant emphasis on the official comment to the support guidelines amendments that incorporated APL. That comment states: *"Nothing in this Rule should be interpreted to eliminate the distinctions between spousal support and alimony pendente lite which are established by case law."* Why would this language have been included if the Supreme Court intended to morph APL into "mere spousal support in a divorce case?"

Based upon the analysis of *Schenk v. Schenk, supra,* and upon our belief that a distinction between APL and spousal support continues to exist in a post-guideline environment, we conclude today that a plaintiff seeking APL must establish some financial need in order to obtain APL. However, we do not necessarily declare that the bar establishing financial

---

[3] There are other differences as well. For example, a spouse may receive APL even when his/her martial misconduct would have barred an award of spousal support. *Wargo v. Wargo*, 154 A.2d 339 (Pa.Super. 1959). Also, spousal support is of indefinite duration, while APL is limited in duration to the time that a proceeding "may with due diligence be prosecuted to conclusion. *Belshy v. Belshy, supra.*

13

need must be high. Financial need cannot be automatically presumed simply because one spouse earns more than another. However, financial need cannot be always foreclosed simply because a spouse with lower income cuts back expenses in order to make his/her ends meet. The standard of living developed by the parties during the marriage, the degree to which either spouse has independent assets available, the extent to which either party receives help in paying expenses, and the nature of the income discrepancy between the parties are all factors that can and must be considered in assessing financial need. In short, a determination of financial need is of necessity a moving target that must be evaluated based upon the unique facts and circumstances of each particular case.

Once a threshold determination of financial need is made, then the support guideline calculations must be undertaken. Under Pa.R.C.P. 1910.16-1(b), a formula identical to spousal support must be employed. This formula necessarily considers the incomes of each party and whether any child support is also owed.

Applying the spousal support formula to an APL case does not totally end the analysis. In *Colonna v. Colonna*, 855 A.2d 648 (Pa. 2004), the Pennsylvania Supreme Court addressed a support guideline question by concluding: "[W]here the incomes of the parties differ significantly, we believe that it is an abuse of discretion for the trial court to fail to consider whether deviating from the support guidelines is

14

appropriate..." *Id.* at 652. Rule 1910.16-5(b) of the guidelines sets forth numerous factors that a court must consider in determining whether to deviate from the guideline formula amount. Those factors are:

(1) Unusual needs and unusual fixed obligations.

(2) The support obligations of the parties.

(3) Other income in the household.

(4) Ages of children.

(5) Assets of parties.

(6) Medical expenses not covered by insurance.

(7) Standard of living of the parties.

(8) In an APL case, the duration of the marriage during which the parties resided together.

(9) Any other appropriate factors.[4]

Sifting through everything outlined above, we hold today that the following analytical paradigm must be employed whenever a spouse seeks APL:

(1) Is a divorce action pending? Because APL is ancillary to divorce, no award can be ordered in the absence of a pending divorce action.

(2) Does the dependent spouse have a financial need for APL? The question of financial need must of necessity be fact-specific and based upon the exigencies of each unique case.

---

[4] In a case involving APL, we believe that an appropriate "other factor" would be whether the assets possessed by the parties will later be attached or divided during equitable distribution. After all, we question the fairness of granting or denying APL because one spouse may temporarily possess an asset that will later be divided between both.

(3) What do the spousal support guidelines require based upon the income of both parties?

(4) Is a deviation from the spousal support guideline amount appropriate based upon the factors set forth in Pa.R.C.P. 1910.16-5(b)?

It is the above analytical paradigm that we will apply to the facts of this case.

### B. Factual Analysis

#### (1) Pending Divorce Action

WIFE filed a Divorce Complaint on June 25, 2013. That Divorce Complaint was never withdrawn. Litigation regarding the parties' divorce is now pending. Thus, APL is a remedy available to WIFE under the Pennsylvania Divorce Code.

#### (2) Financial Need

Stripped of superfluity, HUSBAND posits the following argument: "Wife is able to pay her current expenses with her income. Therefore, she has no financial need." We categorically reject this simplistic argument. A determination of financial need must of necessity analyze far more than whether an obligee spouse has unpaid bills and expenses.

HUSBAND earns almost double the income of WIFE. In terms of dollars and cents, HUSBAND takes home almost $3,000.00 per month in net income more than does WIFE. This is a significant income discrepancy that cannot be ignored.

16

During the marriage, the parties enjoyed an upper middle class lifestyle. It is certainly true that when two spouses separate, neither will be able to enjoy the same lifestyle separately that both were able to enjoy together. Still, a spouse who earns less than her husband should not be expected to endure a standard of living that is degraded considerably below what was previously enjoyed during the marriage. In this case, WIFE has had to "start over" in an apartment. She testified that she has been forced to purchase furniture and other items from a thrift store in order to set up her household. She is no longer able to eat out or enjoy recreational activities as she did prior to separation. In short, WIFE has a need for additional finances in order to raise her lifestyle to a level closer to what she enjoyed pre-separation.

Just as important, we are not blind to the fact that when pursuing or defending litigation, money and financial resources can equal leverage — and we are talking about much more than simply being able to afford lawyers' fees and costs. When a litigant is in a precarious financial situation and is living paycheck-to-paycheck, there is a huge temptation/incentive for that party to settle promptly. Knowledge of this fact affords the opposing party with a negotiating advantage that can be critical. On the other hand, when both parties can enter litigation on a relatively equal financial playing field, neither has an unfair advantage over the other. In this case, the fact that HUSBAND earns far more than WIFE places him in a vastly superior economic position. See, e.g.

17

*DeMasi v.DeMasi*, 597 A.2d 101 (Pa.Super. 1991) (assets and income are the "financial sinews of domestic warfare." *Id.* at 104). Independent of anything else, this type of vastly superior economic position is precisely why APL was developed at common law and by statute.

As noted above, the bar to establishing financial need has never been impossible or even difficult to hurdle. See, *Kuehnle v. Kuehnle*, 157 A.2d 218 (Pa.Super. 1931) ("It is not necessary that [wife] be financially destitute before an [APL] order is made." *Id.* at 219). While we would be reluctant to award APL simply because one spouse earns only percentage points less than the other, neither are we blind to the day-to-day and litigation advantages that $3,000.00 per month can afford to a party. In this case, we agree with the Special Master that WIFE has established financial need for APL. Therefore, we will move forward to apply the rules governing the Pennsylvania Support Guidelines.

### (3)   Guidelines Support Amount

The Special Master determined that the support guidelines result in an award of APL totaling $1,178.00 per month. Neither HUSBAND nor WIFE have challenged the Special Master's determination of income or her calculation of APL using the spousal support guidelines. Accordingly, we will adopt the calculation of the DRM that the guidelines require that HUSBAND pay $1,178.00 per month to WIFE.

18

## (4)    Deviation

The Special Master did not consider deviation from the support guidelines as a possibility, nor did she analyze or discuss any of the support deviation factors. Because we believe that analysis of APL should generally at least contemplate the possibility of deviation, we would prefer to undertake a deviation analysis. Unfortunately, we are significantly hindered in our ability to do so by virtue of the fact that HUSBAND choose not to testify at the APL hearing.

In a *pro se* document filed on October 29, 2014, HUSBAND asserted that his monthly expenses greatly exceeds his income and "I can no longer afford to be represented and maintain any type of a lifestyle I am accustomed to." Unfortunately, we cannot consider HUSBAND's post-hearing protestations of poverty. HUSBAND was afforded the opportunity to provide testimony and documentation at the APL hearing that occurred on August 26, 2014. For whatever misguided reason, HUSBAND voluntarily chose not to present anything. As a practical matter, we are unable to undertake a meaningful deviation analysis as a result.[5]

In absence of testimony and evidence from HUSBAND relative to his financial situation, we are unable to deviate from the formula calculation

---

[5] We are well aware that HUSBAND has retained possession of the marital home. We suspect that expenses relating to the marital home could well exceed the $765.00 per month that WIFE spends in rent for her apartment. (See Exh. 2). This is certainly a factor that we would have considered when determining whether to deviate from the guidelines. Unfortunately, we cannot consider this or any other aspect of HUSBAND's financial condition because he stubbornly refused to provide information regarding that condition.

19

of APL required by the Pennsylvania Spousal Support Guidelines. Accordingly, no deviation from the guidelines will be directed.

## III.  CONCLUSION

On the initial legal question of whether financial need is a prerequisite to an award of APL, we agree with HUSBAND that some showing of financial need is a predicate to an award of APL. However, we categorically reject HUSBAND's position that myopically focuses upon whether WIFE has unpaid expenses. Evaluating financial need requires a global assessment of both spouses' income, expenses, assets and standard of living. APL has always been intended to prevent one spouse from gaining financial leverage over the other during the pendency of a divorce proceeding, and financial need must be assessed with this purpose in mind.

In this case, there is a huge disparity of income between HUSBAND and WIFE. Moreover, WIFE has established to our satisfaction that her current financial situation is tenuous, and that her standard of living has diminished significantly since separation. We conclude that absent APL, HUSBAND would be in a far better position to litigate the parties' divorce than would WIFE. Accordingly, we agree with the Special Master that WIFE has established financial need.

Because we conclude that WIFE has established financial need, we agree with the Special Master's decision to apply the spousal support formula set forth in the Support Guidelines. Although we would have

20

preferred to undertake a deviation analysis under Pa.R.C.P. 1910.16-5(b), we were essentially prevented from doing so by virtue of HUSBAND's decision not to testify or provide documentary evidence. Accordingly, we will adopt the Special Master's guideline formula calculation and will affirm her decision to award WIFE $1,178.00 per month in APL. An Order to accomplish this will be entered today's date.

21